# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JASMINE OLIVER,

     **Plaintiff,**

     **v.**                            **Case No. 22-CV-149**

AMAZON.COM SERVICES, LLC,

     **Defendant.**

## DECISION AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Jasmine Oliver, who is representing herself, sues her former employer, Amazon.com Services, LLC, alleging failure to accommodate and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, *et seq.*; discrimination and retaliation based on sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; and discrimination and retaliation based on race in violation of 42 U.S.C. § 1981. Amazon has moved for summary judgment in its favor as to all of Oliver's claims. (Docket # 49.) For the reasons further explained below, Amazon's motion for summary judgment is granted and Oliver's complaint is dismissed.

## BACKGROUND FACTS

Oliver began her employment with Amazon on November 8, 2018. (Declaration of Casey M. Kaiser ("Kaiser Decl.") ¶ 3, Ex. A, Deposition of Jasmine Oliver ("Oliver Dep.") at 9, 35, Docket # 53-1.) Oliver was employed as a fulfillment associate at the fulfillment center MKE1 in Kenosha. (*Id.* at 24.) Oliver initially worked as a packer in the AFE1 department of the fulfillment center, which consisted of getting packages out of the wall,

packaging them up, and putting them on the conveyer belt. (*Id.* at 25–26.) In January 2019, Oliver was assigned to the "singles department" which consisted of packing single items. (*Id.* at 27–28.) After this assignment, Oliver worked in "flats," where she took the packages packed in the "singles" department and place them on a conveyor belt. (*Id.* at 29.) In October 2019, Oliver was assigned to "re-bin" and "induct." (*Id.* at 26.) Oliver explained that for "induct," the pack department packs up a product into specific bins and then the bins are sent down to the "inductor," who scans each individual item and then sends the item to the "re-binner." (*Id.* at 27.) The "re-binner" then takes the product from the inductor and assembles it in a certain chute. (*Id.*) The item then goes from the "re-binner" to the packer. (*Id.*)

Oliver testified that on July 4, 2019, she was working with another fulfillment associate, Davina McGrown, when McGrown informed Oliver that a rumor was going around that Oliver was transgender. (*Id.* at 51.) In a second conversation shortly thereafter, Oliver asked McGrown where she heard the rumor, and McGrown informed her it was from another fulfillment associate, Kimberly Nash. (*Id.* at 56, 58.) Oliver testified that she confronted Nash about the rumor two or three days later. (*Id.* at 54–55, 59.) Oliver testified that Nash denied starting the rumor, stating that it was another fulfillment associate, Taiveyon Victorian, who started the rumor. (*Id.* at 59–60.) Oliver then confronted Victorian several days later, asking him whether he told Nash that Oliver was transgender, to which Victorian responded that he was not going to answer or spread rumors—a response Oliver took as a denial. (*Id.* at 61.) Oliver testified that she tried to show Victorian her birth certificate, but he refused to look at it. (*Id.* at 61–62.)

2

After speaking with Victorian, Oliver testified that she had conversations with other fulfillment associates regarding the transgender rumor. (*Id.* at 62.) Specifically, several days after her conversation with Victorian, Oliver spoke with an unnamed fulfillment associate who stated that Victorian told him that Oliver was born male and that Victorian was continuing to make the statements regarding Oliver being male even after Oliver confronted him about it. (*Id.* at 62–63.) Oliver testified that McGrown, Nash, and Victorian sexually harassed her by having conversations with other Amazon employees regarding Oliver's alleged transgender status. (*Id.* at 64–66.)

Oliver testified that on approximately July 16, 2019, she went to Amazon's Human Resources department and spoke with Ariel Montgomery regarding the issue. (*Id.* at 69, 71.) Oliver testified that she also spoke with two managers, Cassandra Lenard and Jerry Cornett, about the rumors. (*Id.* at 69–70.) Oliver also spoke with James San in Human Resources after speaking with Montgomery, as well as another unnamed individual. (*Id.* at 72.) Oliver provided Amazon with a handwritten statement regarding the transgender rumor dated July 16, 2019. (*Id.* at 72–73.) Oliver testified that she had two conversations with San in which she verbally informed him of her anxiety and requested to be stationed away from McGrown, Nash, and Victorian as an accommodation for her anxiety. (*Id.* at 75–76, 78–80.) Oliver testified that she also provided typed statements to San in which she requested to be moved. (*Id.*)

Oliver testified that she provided Amazon a note from her doctor dated November 22, 2019 stating that the doctor would "highly recommend to move [Oliver's] work location to avoid people whose names are mentioned in lawsuit for her mental health and for your company's productivity. She will need bathroom breaks for her medical condition and

3

should NOT be penalized for this." (*Id.* at 86, Ex. 2.) Oliver testified that she also provided Amazon with a printout of an after-visit summary stating that she had work-related stress and indicated a diagnosis of PTSD in December. (*Id.* at 87.)

Oliver further testified that sometime between July and December 2019, she experienced sexual harassment at the hands of an unnamed fulfillment associate in the singles department. (*Id.* at 123, 130.) Oliver testified that the individual kept asking her out and stating that he wanted to be with her, despite telling him she was not interested. (*Id.* at 124.) She states the individual also "cussed her out" because she did not want to be with him. (*Id.* at 128.) Oliver states she told San in human resources about this individual in July 2019 (*id.* at 128–29), provided statements, and had multiple meetings with Human Resources, but no one followed-up (*id.* at 131).

Oliver testified that around March 2020, Tommy Lee Robinson began sexually harassing her, calling her his "wife," showing her inappropriate photographs of himself, commenting on her physical appearance, asking her out, and trying to hug her. (*Id.* at 145–53.) Oliver testified that Robinson eventually physically touched her on multiple occasions. (*Id.* at 154–58.) Oliver specifically recounted an incident occurring on March 13, 2020 in the locker room at Amazon where Robinson grabbed Oliver's shoulders and pulled her close to him. (*Id.* at 157–58.) Oliver testified that she stepped away from him, and Robinson threw a label-making machine at her. (*Id.* at 158.) Oliver testified that she called Amazon's ethics line to report the harassment (*id.* at 170), as well as the police and her manager, William Beamer, the same day (*id.* at 162–64).

Oliver testified that on May 18, 2020, while walking through gift wrap on the way to her break, Oliver encountered another fulfillment associate, Marissa Dyess, who was

4

"flaming her arms, and [ ] huffing and [ ] puffing." (*Id.* at 205–06.) Oliver testified that she asked Dyess whether there was a problem and Dyess responded by stating that "if you wanted to go around, you could have went around." (*Id.* at 206.) Oliver testified that she again asked Dyess what the problem was and both women started yelling. (*Id.*) Oliver testified that she saw the security guards come and then left the building to go to her car for her break. (*Id.* at 206–07.) Oliver testified that upon leaving her car, she saw Dyess get out of her car and approach her and another verbal altercation ensued. (*Id.* at 207.) Oliver testified that as the two women walked back into the building, Dyess expressed a desire to physically fight Oliver. (*Id.*) Oliver responded that the cameras and security guards were right there, so Dyess said "Okay, well, then after work, I wanna fight you." (*Id.*) Oliver testified that she was laughing as she approached Andy, an area manager, who asked "what's so funny?" (*Id.*) Oliver testified that she reported the incident to the security guards, but not to Human Resources. (*Id.* at 208.)

Five days later, on May 23, 2010, another incident with Dyess occurred. (*Id.* at 213.) Oliver testified that she yelled at Dyess during the altercation and told her she had been arrested before for fighting. (*Id.* at 220–21.) Oliver testified that Dyess said she wanted to fight Oliver, who responded by telling Dyess "to beat my ass then." (*Id.* at 229, 235.) Oliver testified that two separate employees grabbed Oliver and Dyess to separate them during the altercation. (*Id.* at 240–41.) After meeting with Human Resources that day, Oliver was told she was being suspended pending investigation of the incident. (*Id.* at 235.) Oliver testified that the next contact she had with Amazon was a telephone call, which Oliver did not answer, and then an email from Human Resources informing her she was being terminated.

(*Id.* at 241–42.) Oliver received a termination letter a couple of days later. (*Id.* at 242.) Her employment was officially terminated on June 18, 2020. (*Id.* at 37.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

6

**ANALYSIS**

*1.     Judicial Estoppel*

As an initial matter, Amazon argues that Oliver is judicially estopped from pursuing any of her claims against Amazon because she failed to disclose them to the bankruptcy court in her bankruptcy case. (Docket # 50 at 2.) Oliver filed for bankruptcy on October 4, 2018, just prior to beginning her employment with Amazon. (Request for Judicial Notice, Ex. A, Docket # 56-1.)[1] Oliver's bankruptcy case was dismissed on June 10, 2020. (*Id.*, Ex. D, Docket # 56-4.)

Judicial estoppel is an equitable doctrine, invoked to protect the integrity of the courts by preventing a party who prevails on one ground in a lawsuit from repudiating that ground in a subsequent lawsuit. *See DeVito v. Chicago Park Dist.*, 270 F.3d 532, 535 (7th Cir. 2001). In the context of a bankruptcy, judicial estoppel is used to bar a debtor from pursuing a cause of action after the bankruptcy ends that he or she failed to disclose to the bankruptcy court during the course of the bankruptcy proceedings. *See Cannon-Stokes v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006). In other words, a debtor in bankruptcy who denies owning an asset, including a chose in action or other legal claim, cannot realize on that concealed asset after the bankruptcy ends. *Id.* Although this doctrine is seemingly harsh, the theory behind it is that it "induces debtors to be truthful in their bankruptcy filings[, which] will assist creditors in the long run (though it will do them no good in the particular case)—and it will

<hr>

[1] I take judicial notice of the filings of the bankruptcy court in *In re Jasmine Shaquia Oliver*, Case No. 2018-29450-BEH (E.D. Wis.). *See Opoka v. I.N.S.*, 94 F.3d 392, 394 (7th Cir. 1996) ("This court, however, has the power, in fact the obligation, to take judicial notice of the relevant decisions of courts and administrative agencies, whether made before or after the decision under review.").

7

assist most debtors too, for the few debtors who scam their creditors drive up interest rates and injure the more numerous honest borrowers." *Id.*

Courts have repeatedly observed that judicial estoppel is a discretionary doctrine, and there is no set formulation for deciding when to apply it. *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001) ("In enumerating these factors, we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts."); *accord Walton v. Bayer Corp.*, 643 F.3d 994, 1002 (7th Cir. 2011) ("For reasons we don't understand, the cases are coy about defining [judicial estoppel]."). Factors courts consider include: (1) whether the plaintiff took an inconsistent position in earlier litigation; (2) whether the plaintiff prevailed on that claim; and (3) if the claim is not estopped, either the plaintiff will derive an unfair advantage or the defendant will suffer an unfair detriment. *Id.* The three factors are not a "test" for when judicial estoppel should apply; it remains a discretionary doctrine a court may apply as needed to protect interested parties and the integrity of the judicial system. *Id.*

Oliver argues that judicial estoppel should not apply in this case because she answered "Yes" to the question on Schedule B of her bankruptcy petition as to whether she had any third-party claims or potential claims and because her bankruptcy attorney was aware of her potential claims against Amazon. (Docket # 65 at 6.) In her Amended Schedule A/B: Property dated December 4, 2018, Oliver does answer "Yes" to the question regarding whether she has any claims "against third parties, whether or not you have filed a lawsuit or made a demand for payment"; however, Oliver specifically lists only a "potential small claims lawsuit against Santander" worth $2,500. (Docket # 56-2 at 5.) Nowhere does

8

Oliver report her potential lawsuit against Amazon. Nor does it appear Oliver ever attempts to amend her property schedule at any time before dismissal of her bankruptcy action, even after filing her first Wisconsin Equal Rights Division ("ERD")/Equal Employment Opportunity Commission ("EEOC") complaint on August 28, 2019. (Kaiser Decl. ¶ 4, Ex. B.) Rather, Oliver argues that she disclosed the information to her bankruptcy attorney and she was under the belief from her counsel that she did not need to update the schedules. (Docket # 65 at 9.)

Oliver's explanation for failing to disclose her potential claims against Amazon is weak, at best. In support of her claim that she informed bankruptcy counsel of her potential claims against Amazon, Oliver presents an email dated June 30, 2020 stating that she "currently [has] a few pending complaints against my employer for refusing to accommodate me for PTSD." (Docket # 65-1 at 15.) This email was sent months after her ERD/EEOC complaints against Amazon were filed and was sent in response to bankruptcy counsel's office contacting her regarding the bankruptcy trustee moving to dismiss her case for failing to make the required plan payments. (*Id.*)

Despite Oliver's failure to inform the bankruptcy court of her potential claims, I decline to apply judicial estoppel in this case. While bankruptcy counsel informed Oliver of the trustee's motion to dismiss for failure to make the required plan payments, no objections were ultimately filed to the trustee's June 10, 2020 motion and thus the case was dismissed. (Docket # 56-4.) Thus, it is unclear whether Oliver truly benefited from this bankruptcy filing and whether inclusion of this potential claim against Amazon would have made a difference. Nor is it clear that without judicial estoppel, either Oliver will derive an unfair

advantage or Amazon will suffer an unfair detriment. For these reasons, I decline to apply judicial estoppel to Oliver's claims.

2. *The Merits of Oliver's Claims*

Oliver sues Amazon under the ADA for failure to accommodate and retaliation; under Title VII for sex discrimination, sexual harassment, and retaliation; and under § 1981 for race discrimination and retaliation. I will address each claim in turn.

2.1 ADA Discrimination

Oliver alleges that Amazon discriminated against her based on her disability. The ADA prohibits employers from discriminating against disabled employees because of their disability. 42 U.S.C. § 12112(a); *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 600 (7th Cir. 2011). To prove a violation of § 12112(a), Oliver must show that: (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) she suffered an adverse employment action; and (4) the adverse action was caused by her disability. *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022).

Oliver argues that she suffers from an anxiety disorder and PTSD. (Kaiser Decl. ¶¶ 5, 7, Exs. C, E.) Amazon argues that Oliver was not qualified to perform the essential functions of the job with or without a reasonable accommodation because she engaged in fighting and/or threatening behavior in the workplace. (Docket # 50 at 8–13.) Oliver argues that her disability was ignored prior to the two altercations on May 18 and May 23 with Dyess and that Amazon allowed other employees to retain their employment despite destroying company property, making threats, and having a negative attitude. (Docket # 65 at 12.) Oliver argues that Amazon provided other employees accommodations that she was

10

not provided, and thus inconsistently applied its policies. (*Id.*) Oliver argues that she was placed in disadvantageous workstations, reassigned, and terminated based on her disability. (*Id.* at 12.)

Even assuming, *arguendo*, Oliver could meet the first three elements of her *prima facie* case of ADA discrimination, the undisputed evidence in the record does not support that any adverse employment action she suffered was caused by her disability. Oliver testified that during her employment with Amazon she was assigned to various positions within the facility, including packer, "re-bin," singles, flats, and induct. (Oliver Dep. at 26–31.) Oliver presents no evidence, however, connecting these work assignments to her alleged disabilities. Furthermore, Amazon asserts that it has a policy in place prohibiting violence in the workplace and that fighting or threatening violence in the workplace also violates Amazon's Standards of Conduct. (Declaration of Rykiel Rome ("Rome Decl.") ¶ 5, Exs. A and B.) In Amazon's "Owner's Manual and Guide to Employment" dated January 2019, it states that "abusive, vulgar, or harassing language to a supervisor, fellow associate, or vendor" is considered a "serious" infraction that will "generally result in corrective action" (*id.*, Ex. A at 28) while "fighting or threatening violence in the workplace" is an "extremely serious" infraction that may result in termination after one offense (*id.* at 27). Amazon asserts that Oliver was terminated due to her violation of Amazon's workplace policy against violence and its Standards of Conduct stemming from the May 23, 2020 altercation with Dyess. (Rome Decl. ¶ 22; Declaration of Tifashia Norphlet ("Norphlet Decl.") ¶ 16.)

Oliver does not dispute that she engaged in several behaviors that violate Amazon's Standards of Conduct. Oliver testified that during the May 18 altercation with Dyess, she used "vulgar" language to a "fellow associate," stating "fuck you" to her. (Oliver Dep. at

11

212.) She further testified that during the May 23 altercation with Dyess, she was yelling, she told Dyess that she had previously been arrested for fighting, and she told Dyess that she should "beat my ass." (*Id.* at 220–22.) Oliver testified that two separate employees had to grab both her and Dyess to separate them during the altercation. (*Id.* 240–41.) While Oliver contends that her disability prevents her from controlling her emotions when provoked (*id.* at 117, 222), in the end, Oliver presents no evidence disputing that Amazon terminated her employment due to violating Amazon's company policies.

Furthermore, even if Oliver's disability caused her to engage in this behavior, the Seventh Circuit has found that, "if an employer fires an employee because of the employee's unacceptable behavior, the fact that that behavior was precipitated by a mental illness does not present an issue under the Americans with Disabilities Act." *Palmer v. Cir. Ct. of Cook Cnty., Ill.*, 117 F.3d 351, 352 (7th Cir. 1997). The court in *Palmer* found that the ADA:

> [D]oes not require an employer to retain a potentially violent employee. Such a requirement would place the employer on a razor's edge—in jeopardy of violating the Act if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone. The Act protects only "qualified" employees, that is, employees qualified to do the job for which they were hired; and threatening other employees disqualifies one.

> It is true that an employer has a statutory duty to make a "reasonable accommodation" to an employee's disability, that is, an adjustment in working conditions to enable the employee to overcome his disability, if the employer can do this without "undue hardship." But we cannot believe that this duty runs in favor of employees who commit or threaten to commit violent acts. The retention of such an employee would cause justifiable anxiety to coworkers and supervisors. It would be unreasonable to demand of the employer either that it force its employees to put up with this or that it station guards to prevent the mentally disturbed employee from getting out of hand. So clear is this that we do not think a remand is necessary to explore the possibilities of accommodation.

*Id.* at 352–53 (internal citations omitted). The same applies here. For these reasons, Oliver's ADA discrimination claim fails.

### 2.2    ADA Failure to Accommodate

Oliver asserts that several co-workers, including McGrown, Nash, and Victorian, subjected her to sexual harassment and that the harassment triggered her disability. (Oliver Dep. at 77–80.) Oliver asserts that she alerted Amazon to her disability (*id.* at 78) and requested an accommodation in the form of moving her workstation away from those individuals (*id.* at 81–82). Oliver argues that Amazon did not honor this request.

To establish a *prima facie* failure to accommodate claim under the ADA, Oliver must show that: (1) she was a qualified individual with a disability; (2) Amazon was aware of her disability; and (3) Amazon failed to reasonably accommodate her disability. *E.E.O.C. v. AutoZone, Inc.*, 809 F.3d 916, 919 (7th Cir. 2016).

The crux of Oliver's argument is that working near McGrown, Nash, and Victorian triggered her anxiety and PTSD. Thus, she testified that her requested accommodation for her disability was to be assigned to a workstation away from those individuals. (*Id.* at 81–83.) But "the Seventh Circuit rejected the argument that a person is disabled where the alleged disability is linked only to working alongside particular colleagues or supervisors in a particular job or work location." *Summers v. Target Corp.*, 382 F. Supp. 3d 842, 847 (E.D. Wis. 2019) (citing *Weiler v. Household Finance Corp.*, 101 F.3d 519, 525 (7th Cir. 1996)); *see also Pack v. Illinois Dep't of Healthcare & Fam. Servs.*, No. 13-CV-8930, 2015 WL 507555, at *3 (N.D. Ill. Feb. 5, 2015); *Scott v. Kaneland Cmty. Unit Sch. Dist. No. 302*, 898 F. Supp. 2d 1001, 1005–06 (N.D. Ill. 2012). In *Weiler*, the Seventh Circuit found that:

> [Plaintiff] claims she can do her job, but not while being supervised by Terry Skorupka. If [Plaintiff] can do the same job for another supervisor, she can do the job, and does not qualify under the ADA. We conclude that Weiler is not 'disabled' as that term is used in the ADA.

101 F.3d at 525. "The clear teaching of *Weiler* is that the fact that the plaintiff is unable to work for a particular supervisor, whether because of anxiety or extreme dislike, is not a disability within the meaning of the ADA." *Summers*, 382 F. Supp. 3d at 848.

The rationale of *Weiler* applies with equal force here. Oliver does not contend that her anxiety and PTSD, in and of itself, makes her unable to perform her work. Indeed, Oliver *did* perform her work at Amazon for months despite her anxiety and PTSD. Rather, Oliver alleges that she cannot perform her work at Amazon while working alongside particular colleagues whose presence "triggers" her disability. But the *Weiler* court makes clear that "'exclusion from one position of employment does not constitute a substantial limitation of a 'major life activity'"; rather, "with respect to the major life activity of working, 'substantially limits' must mean significantly restricts the ability to perform a class of jobs or a broad range of jobs in various classes." 101 F.3d at 525 (quoting *Byrne v. Bd. of Educ., Sch. of W. Allis-W. Milwaukee*, 979 F.2d 560, 565 (7th Cir. 1992)). Because the undisputed facts show that Oliver is not a qualified individual with a disability under the ADA, her failure to accommodate claim fails.

### 2.3 Title VII: Sex Discrimination and Sexual Harassment

Oliver alleges that she experienced discrimination and harassment on the basis of her sex in violation of Title VII. Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). Sexual

14

harassment "is a form of sex discrimination in the terms or conditions of employment that consists of efforts by either co-workers or supervisors to make the workplace intolerable or at least severely and discriminatorily uncongenial to members of a certain sex (hostile work environment harassment) and of efforts (normally by supervisors) to extract sexual favors by threats or promises (quid pro quo harassment)." *Schele v. Porter Mem'l Hosp.*, 198 F. Supp. 2d 979, 987–88 (N.D. Ind. 2001) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751–52 (1998)); *see also Savino v. C.P. Hall Co.*, 988 F. Supp. 1171, 1180 (N.D. Ill. 1997) (stating that Title VII encompasses two types of sexual harassment: hostile work environment and quid pro quo). Oliver alleges that she was subjected to hostile work environment sexual harassment. I will address each claim in turn.

### 2.3.1   Sex Discrimination

Oliver alleges that she was terminated from her employment on the basis of her sex. (Docket # 65 at 17.) In discrimination cases, "[w]hen a defendant moves for summary judgment, the singular question for the district court is whether the plaintiff has introduced evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (internal quotation and citations omitted). "Whether a plaintiff offers direct or circumstantial evidence of discrimination, this court made clear in *Ortiz v. Werner Enters., Inc.* that 'all evidence belongs in a single pile and must be evaluated as a whole.'" *Id.* (citing *Ortiz*, 834 F.3d at 766).

However, "[o]ne way of proving employment discrimination under Title VII remains the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S. Ct. 1817,

36 L.Ed.2d 668 (1973)." *Id.* "The familiar *McDonnell Douglas* approach requires a plaintiff to make a *prima facie* case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Id.* (internal quotation and citation omitted). To make a *prima facie* case under *McDonell Douglas*, a plaintiff must show: (1) she belongs to a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated employee outside of her protected class received better treatment from her employer. *Id.* "But a plaintiff need not use the *McDonell Douglas* framework after *Ortiz.*" *Id.* At summary judgment, "[w]hat matters is whether [a plaintiff] presented enough evidence to allow the jury to find in [his] favor." *Id.* at 957–58.

In this case, while Oliver makes passing reference in her brief to her being terminated due to her sex (Docket # 65 at 17, 22), her brief contains no argument connecting her termination to her alleged sex discrimination. She does not, for example, present evidence of similarly situated male employees receiving better treatment from Amazon. "Perfunctory and undeveloped arguments are waived." *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016). Thus, Oliver's claim of sex discrimination under Title VII is dismissed.

### 2.3.2 Hostile Work Environment Sexual Harassment

Oliver argues that she was subjected to unwelcome, abusive, offensive, and harassing sexually discriminatory conduct at the hands of several co-workers during her employment with Amazon and the conduct was sufficiently severe and pervasive so as to create a hostile work environment. (Docket # 65 at 27–28.)

16

Title VII's "prohibition on discrimination also reaches the creation of a 'hostile or abusive work environment . . . permeated with discriminatory intimidation, ridicule, and insult.'" *Trahanas v. Nw. Univ.*, 64 F.4th 842, 853 (7th Cir. 2023) (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)). To establish a hostile work environment claim, a plaintiff must show: (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Id.*

Different standards apply in evaluating an employer's liability for a hostile work environment, depending on whether the alleged harasser is the victim's supervisor or coworker. *Id.* For supervisors, an employer is strictly liable when a "supervisor's harassment culminates in a tangible employment action." *Id.* (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)). Absent such action, an employer may raise an affirmative defense to avoid liability. *Id.* But when the harasser is a coworker, "the employer is liable only if it was negligent in controlling working conditions." *Id.*

Oliver alleges several instances that she asserts created a hostile work environment. First, she alleges that three co-workers, McGrown, Nash, and Victorian, sexually harassed her by having conversations with Oliver and/or with other Amazon employees regarding Oliver's alleged transgender status. (Oliver Dep. at 64–66.) Second, Oliver alleges that sometime between July and December 2019, an unnamed fulfillment associate repeatedly asked her out and stated that he wanted to be with her, despite telling him she was not interested. (*Id.* at 123–24, 130.) She asserts that this individual also "cussed her out" because she did not want to be with him. (*Id.* at 128.) Finally, Oliver argues that around March 2020, Tommy Lee Robinson began sexually harassing her, calling her his "wife," showing

17

her inappropriate photographs of himself, commenting on her physical appearance, asking her out, and trying to hug her. (*Id.* at 145–53.) Oliver testified that Robinson eventually physically touched her by pulling her close to him and trying to throw a label machine at her. (*Id.* at 154–58.)

As to the rumors regarding her alleged transgender status, Oliver has not shown that these alleged instances of harassment were severe or pervasive as contemplated by Title VII. "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citation omitted). In *Harris*, the Supreme Court explained:

> This standard, which we reaffirm today, takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury. As we pointed out in *Meritor*, "mere utterance of an . . . epithet which engenders offensive feelings in a employee," *ibid*. (internal quotation marks omitted) does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Id.* at 21–22. While it is inappropriate to ask a co-worker their gender status and to spread rumors regarding a co-worker's gender, Oliver in this case has not shown conduct that is severe or pervasive enough to create an objectively hostile or abusive work environment. Nor does Oliver assert that she subjectively perceived the environment to be abusive. Oliver testified that she does not have any personal feelings towards transgender individuals, nor

18

does she have a "problem" with "their lifestyle." (Oliver Dep. at 52–53.) Thus, it is unclear as to why these alleged rumors were subjectively severe enough to create an abusive work environment.

As to the unnamed fulfillment associate and Tommy Lee Robinson, however, considering the evidence in the light most favorable to Oliver, both employees' actions arguably are severe or pervasive enough to create a hostile work environment. While the Seventh Circuit has held that a grant of summary judgment was appropriate despite a plaintiff being subjected to propositions, lewd comments, and a slap on the buttocks when these were relatively isolated instances, *see Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993), as to the unnamed fulfillment associate, Oliver testified that between July and December 2019, this individual made unwanted sexual advances towards her on more than 20 occasions, at times repeatedly asking her out for hours during their shift after telling him she was not interested. (*Id.* at 124, 140–42.) Crediting Oliver's testimony, she has offered evidence of conduct that goes beyond isolated instances of harassment.

And as to Robinson, Oliver testified that he showed her an "almost half-naked picture of himself," asked her out, commented on her physical appearance, spoke to her about raping women, rubbed her lower back, tried to hug her, grabbed her shoulders, and repeatedly referred to her as his wife. (*Id.* at 146–60.) Furthermore, Oliver called the Kenosha Police Department to report Robinson after he threw a label-making machine at her after telling him that she was not interested in him. (*Id.* at 160–65.) While "[t]here is no 'magic number' of incidents required to establish a hostile environment," one act of "egregious harassment" can suffice. *E.E.O.C. v. Int'l Profit Assocs., Inc.*, 654 F. Supp. 2d 767,

783 (N.D. Ill. 2009). Thus, as to Robinson, a reasonable factfinder could conclude that his conduct created a hostile work environment.

To succeed on a hostile work environment claim, however, Oliver must also establish a basis for employer liability. *See Vance*, 570 U.S. at 424. Oliver does not contend that either the unnamed fulfillment associate or Robinson were her supervisors. Thus, Amazon is only liable for these allegedly harassing employees if Amazon was negligent in controlling working conditions. *Id.* "Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant" to determining an employer's negligence. *Id.* at 449.

Oliver presents no evidence that Amazon does not have a policy prohibiting sexual harassment nor does she contend that Amazon does not have a system for reporting sexual harassment complaints. In fact, Oliver testified that Amazon has an "ethics" line in which she reported Robinson's alleged harassment (Oliver Dep. at 162) and she testified that she reported both the unnamed employee's and Robinson's harassment to human resources on multiple occasions (*id.* at 70–73, 128–31, 162). The crux of Oliver's argument is that despite complaining of the harassment, Amazon failed to take any remedial action consistent with its policy. (Docket # 65 at 27–28.)

As to the unnamed employee, Oliver testified that she never reported this individual's conduct to her manager, who was nearby, contemporaneously while it was happening. (Oliver Dep. at 142–43.) And while she testified that she reported the alleged harassment to human resources, because she did not know the person's name, she never identified the individual to human resources. (Oliver Dep. at 130–31.) Oliver testified that

20

human resources told her that while "I want you to feel safe, I do, but maybe if you had a name." (*Id.* at 131.)

While Oliver contends that Amazon was negligent in following up with her complaint against the anonymous employee, Oliver has failed to put forth evidence in which a rational trier of fact could find Amazon negligent in its response to her complaint. Again, Oliver did not have the name of her alleged harasser, only a physical description that he had "dark skin" and was "maybe five-nine or five-ten" with a "medium build." (*Id.* at 125–26.) Amazon is not a small, "mom and pop" company; the Kenosha warehouse where Oliver worked employs many people. It would not have been reasonable for Amazon to question every employee who fits Oliver's very general description of her alleged harasser. Oliver acknowledges that she never spoke to her manager about the harassment, who she testified worked nearby, contemporaneous to the alleged harassment. This manager likely could have positively identified the individual, thus allowing human resources to conduct an investigation. For these reasons, Oliver has failed to establish employer liability as to the unnamed fulfillment clerk.

As to Robinson, Oliver testified that after he allegedly threw a label machine at her, she called Amazon's ethics hotline to report Robinson's sexual harassment. (*Id.* at 162.) Oliver testified that at this point, she did not know Robinson's last name. (*Id.*) Amazon's ethics portal records confirms that an anonymous complaint about an employee named "Tommy," was reported; however, human resources business partner Rykiel Rome avers that there are numerous employees named "Tommy" working at Oliver's work site. (Declaration of Rykiel Rome ¶ 21, Docket # 52.) Later that same day, Oliver testified that she called the Kenosha Police Department to report Robinson's harassment. (Oliver Dep. at

163.) Oliver testified that she met with the Kenosha Police Department, human resources business partner Tyrell Townsend, and loss prevention regarding Robinson's alleged harassment. (*Id.* at 164–65.) Oliver acknowledged that she told the officers that she did not want them to speak with Robinson because "when you're dealing with today's society and a black man and police officers[,] I did not feel comfortable with four officers talking to one black man." (*Id.* at 167.) Townsend avers that after meeting with Oliver, loss prevention, and the Kenosha Police Department, Oliver stated that she did not want him to investigate or follow-up on Robinson. (Declaration of Tyrell Townsend ¶ 5, Docket # 54.) Oliver testified that after the officers left, she did not speak to Townsend about Robinson. (Oliver Dep. at 168.)

Here too, Oliver has failed to show that Amazon was negligent in controlling working conditions. Although she contends she called Amazon's ethics hotline, she did not give her name and only gave the name "Tommy" as her alleged harasser. Once again, Amazon is not a small company with only a few employees—Rome avers that Amazon employs numerous individuals named "Tommy" at its Kenosha facility. As stated before, it would not be reasonable to expect Amazon to begin questioning every "Tommy" employed at the facility about a complaint regarding an unknown victim. And Oliver does not dispute that Amazon's human resources department participated in addressing her complaint against Robinson and does not dispute that she told the officers that she did not want to pursue Robinson further. Oliver testified that she did not speak to Townsend about Robinson after the meeting concluded. Thus, even discounting Townsend's averment that Oliver specifically told him she did not want him to pursue Robinson, it was reasonable for Amazon to believe that she did not want to pursue the case further given her lack of follow-

22

up with human resources and her statement to the officers that she did not want to pursue the matter further.

On this record, no reasonable juror would find that Oliver meets all of the elements of her hostile work environment claim. Summary judgment is granted in favor of Amazon as to this claim.

### 2.3.3   Retaliation

Oliver argues that Amazon retaliated against her for filing her ERD complaints. Title VII prohibits employers from retaliating against their employees because an employee complained of discrimination. 42 U.S.C. § 2000e-3(a). To survive summary judgment on a retaliation claim, a plaintiff must come forward with sufficient evidence for a reasonable jury to conclude that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) causation. *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 761 (7th Cir. 2022).

Oliver filed several charges/complaints of discrimination with the ERD and the EEOC. The first charge was filed on August 28, 2019 (Kaiser Decl. ¶ 4, Ex. B) and Oliver filed an amended charge on November 1, 2019 (*id.* ¶ 5, Ex. C). Oliver filed a second discrimination charge on January 24, 2020 (*id.* ¶ 6, Ex. D) and a third charge on June 19, 2020 (*id.* ¶ 7, Ex. E).

Oliver alleged she faced several adverse employment actions in retaliation for filing her discrimination complaints. First, she argues that she was placed in "disadvantageous positions" and was assigned to "re-bin" and "induct" in October 2019, an assignment that is "more rigorous" than her previous assignments. (Docket # 65 at 26.) Her employment was also terminated in June 2019. For purposes of Title VII, adverse employment actions are

23

"material, sufficiently important alterations of the employment relationship." *West v. Radtke*, 48 F.4th 836, 849 (7th Cir. 2022) (internal quotation and citation omitted). This means "something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* In *West*, the Seventh Circuit stated that:

> Broadly speaking, three types of employment actions meet the threshold: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge.

*Id.* Once again, Oliver's first charge of discrimination was filed on August 28, 2019. Oliver began her job at Amazon as a packer (Oliver Dep. at 25–26) and was re-assigned in January 2019 to the "singles department" (*id.* at 27–28). Although she could not remember the exact dates, sometime thereafter she also worked in "flats." (*Id.* at 29.) It was in October 2019 that she was assigned to "re-bin" and "induct." (*Id.* at 26.) Oliver testified as to what each of these jobs involved, and it appears they are all inter-related. The packer gets packages "out of the wall," packages them up, and puts them on the conveyer belt. (*Id.* at 25–26.) The "singles" department consists of packaging single items. (*Id.* at 27–28.) In "flats," one takes the packages packed in "singles" and places them on a conveyor belt. (*Id.* at 29.) And in "induct," the "inductor" takes product packed by the packing department and scans it, and then sends it to the "re-binner," who takes it and assembles it in a certain chute. (*Id.* at 27.) While Oliver believes re-bin and induct are "more rigorous" than being in "singles," "flats," or a "packer," a mere alteration of job duties does not constitute an adverse employment action. Thus, Oliver's retaliation claim as to these actions fails.

24

Oliver was also terminated from her employment, which undoubtedly constitutes an adverse employment action. Oliver must still show, however, a causal link between her protected activity and the adverse employment action. To show causation, employees may point to circumstantial evidence, such as "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Lewis*, 36 F.4th at 761 (internal quotation and citation omitted). Plaintiffs may also make use of the *McDonnell Douglas* framework in the retaliation context. *Id.* Ultimately, "[t]he key question is whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action." *Id.* (internal quotation and citation omitted).

Oliver contends that Amazon's proffered reason for terminating her employment, the May 23, 2010 incident with Dyess, was pretextual. (Docket # 65 at 18–27.) Oliver relies primarily on "Exhibit A" to her brief in opposition to Amazon's summary judgment motion. (Docket # 65-1.) Although it is not entirely clear, Exhibit A appears to be the termination email Oliver received dated June 19, 2020. (Oliver Dep. at 242; Docket # 65-1 at 2, 5.) Using an online tool called "metadata2go," Oliver contends that the termination email was created on May 8, 2020, prior to the May 23, 2010 incident with Dyess. (Docket # 65-1 at 3.) Oliver argues that this proves that Amazon planned on firing her before the incident occurred, demonstrating that her termination was in fact due to her filing EEOC/ERD complaints. (Docket # 65 at 18.)

Oliver's reliance on the "metadata2go" tool is highly problematic. Oliver does not contend that she is qualified as an expert in extracting and analyzing metadata and she presents no expert evidence addressing this issue. *See Weber v. Pierce Cnty. Wisconsin Dep't of*

25

*Hum. Servs.*, No. 21-CV-300-WMC, 2022 WL 4103931, at *2 (W.D. Wis. Sept. 8, 2022). It is entirely unclear how metadata2go.com operates or its limitations. At least one court has questioned the reliability of this specific tool, noting that the tool "is not one designed to show alteration of metadata" rather, it shows "whether metadata exists." *Aminov v. Berkshire Hathaway Guard Ins. Companies*, No. 21-CV-479-DG-SJB, 2022 WL 818944, at *2 (E.D.N.Y. Mar. 3, 2022). As Amazon notes, it may be that Amazon simply repurposed the termination letter of a different associate, updating it to include Oliver's information, thus explaining why metadata for the document exists. (Docket # 69 at 12.) But Oliver's speculation as to the document's metadata is insufficient to defeat Amazon's summary judgment motion.

Furthermore, even if Amazon decided to terminate Oliver's employment on May 8, 2020, Oliver first filed a discrimination charge on August 28, 2019, more than eight months before the May 8, 2020 date alleged. The Seventh Circuit has found that suspicious timing, in and of itself, is rarely sufficient to create a triable issue on summary judgment. *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). Rather, "for a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate that 'an adverse employment action follows close on the heels of protected expression, and the plaintiff [must] show that the person who decided to impose the adverse action knew of the protected conduct.'" *Id.* (quoting *Lalvani v. Cook Cnty.*, 269 F.3d 785, 790 (7th Cir. 2001)). The Seventh Circuit has found a period of four months between the protected activity and the adverse action insufficient to prove causation. *See Longstreet v. Illinois Dep't of Corr.*, 276 F.3d 379, 384 (7th Cir. 2002). Thus, while Oliver remained employed for months after filing both her first and second discrimination complaints, it was on the heels of the May 23, 2020 incident with Dyess that Oliver's employment was terminated. For these reasons, Oliver has

26

failed to show a causal link between the protected activity and her termination. Summary judgment is granted in favor of Amazon as to Oliver's retaliation claim.

### 2.4    Section 1981 Race Discrimination

Oliver brings a claim for race discrimination and retaliation under § 1981. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." *Walker v. Abbott Lab'ys*, 340 F.3d 471, 475 (7th Cir. 2003) (quoting 42 U.S.C. § 1981(a)). Section 1981 encompasses both race discrimination in employment and retaliation claims. *See id.*; *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008). The legal analysis for discrimination claims under Title VII and § 1981 is largely identical. *Lewis*, 36 F.4th at 759. As stated above, to succeed on a Title VII discrimination claim, an employee must prove (1) that she is a member of a protected class, (2) that she suffered an adverse employment action, and (3) causation. *Id.* Where the two claims diverge, however, is that Title VII simply requires that race be a "motiving factor" in the defendant's challenged employment decision, whereas under § 1981, a plaintiff bears the burden of showing that race was a but-for cause of her injury. *Id.* And as also stated above, one way of proving employment discrimination is under the familiar *McDonnell Douglas* burden-shifting framework. *Id.*

Oliver argues that Amazon failed to promote her and ultimately terminated her employment due to her race. (Docket # 65 at 17, 23–24, 27–29.) It appears Oliver proceeds under the *McDonell Douglas* framework, relying primarily on the premise that similarly situated white employees were treated more favorably than her. (*Id.*) In the employment context, for an employee to be similarly situated, the plaintiff must demonstrate that there is

27

someone who is directly comparable to her in all material aspects. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004). When determining whether employees are similarly situated, courts consider whether the employees: (1) had the same job description; (2) were subject to the same standards; (3) were subject to the same supervisor; and (4) had comparable experience, education, and other qualifications. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007).

Oliver argues that although Amazon states that she was terminated due to the altercation with Dyess, she asserts that several white employees also engaged in threatening behavior and yet were not terminated. (Docket # 65 at 23.) Oliver cites to "an employee who is white" who threatened "Vanessa"; "Rachel" who "engaged in violence where she threatened violence and was neither suspended nor terminated because she is white"; and "Tammie and Kyle," two white associates "who were neither disciplined as harsh as the Plaintiff because they are white." (*Id.* at 23–24.) In support, Oliver again cites to Exhibit A to her brief. (*Id.*)

Despite careful review of Exhibit A, I cannot find any evidence regarding Rachel, Tammie, or Kyle to demonstrate that they are indeed similarly situated. Oliver does not present these individual's job titles and descriptions; does not explain whether they were subject to the same standards and supervisors; nor does she show whether they had comparable experience, education, and other qualifications. Oliver fails to explain the facts and circumstances of the incidents these employees allegedly engaged in, how she has personal knowledge of the incidents, and how she has personal knowledge regarding management's response to the incidents.

28

As to the "white employee" who allegedly threatened "Vanessa," Oliver includes the declaration of Vanessa Oliver, in which Vanessa Oliver avers that she worked in the singles department at the Amazon Fulfillment Center in Kenosha and was involved in a dispute with a white co-worker over the co-worker's tattoo. (Docket # 65-1 at 116.) Vanessa asserts that the co-worker made threats and became aggressive, and when she reported the incident to management, management required the co-worker to cover her tattoo but did not suspend or terminate her. (*Id.*) Vanessa alleges that this employee was aggressive with management and/or with her on at least three occasions, but she has not been fired. (*Id.*)

Once again, Oliver does not address whether this white employee who had incidents with Vanessa Oliver was directly comparable to her in all material respects. It is unclear what position this white co-worker held; whether she was subject to the same standards and supervisors; or whether she has comparable experience, education, and other qualifications. Furthermore, Oliver presents little detail as to the tattoo incident, and no details as to the other incidents in which this white co-worker allegedly became aggressive. It is also unclear how Vanessa Oliver has personal knowledge as to management's investigation and/or response to any of these incidents. While comparators need not be clones, the distinctions between the plaintiff and the proposed comparators must not be so significant as to render the comparison effectively useless. *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). Oliver fails to present sufficient evidence to render an effective comparison.

Oliver further argues that Amazon failed to promote her due to her race. (Docket # 65 at 28–29.) Oliver argues that several white employees, including Kristal Roe, Elizabeth Peters, Marissa, Jeg, Kevin, Bri, and "other employees who were white" and less qualified were promoted when she was not. (*Id.*) But once again, Oliver provides no admissible

evidence that any of these individuals were less qualified for any specific position than she was. Speculation and Oliver's say-so cannot substitute for admissible evidence to defeat summary judgment. For these reasons, Oliver's race discrimination claim under § 1981 fails.

Finally, Oliver argues that she was retaliated against based on race. (Docket # 65 at 17.) As with race discrimination claims, the Seventh Circuit has generally applied the same *prima facie* requirements to retaliation claims brought under Title VII and section 1981. *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). To defeat summary judgment on a retaliation claim, Oliver must offer evidence from which a reasonable jury could find that: (1) she engaged in an activity protected by the statute; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022).

Oliver fails to develop an argument as to her alleged retaliation claim due to race. It is undisputed that Oliver did not bring either a discrimination or retaliation claim based on race before the EEOC/ERD (Docket # 53-2; Docket # 53-3; Docket # 53-4; Docket # 53-5), nor does Oliver testify that she experienced race discrimination or otherwise reported race discrimination to Amazon (*see generally* Oliver Dep.). To engage in "protected activity" means to take "some step in opposition to a form of discrimination that the statute prohibits." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017). In this case, it is unclear what protected activity Oliver is alleging as to her § 1981 retaliation claim based on race. For these reasons, Oliver's retaliation claim under § 1981 fails. Summary judgment is granted in favor of Amazon as to Oliver's § 1981 claims.

## CONCLUSION

Oliver sues her former employer, Amazon, for violations of the ADA, Title VII, and § 1981. Amazon moves for summary judgment in its favor, first arguing that Oliver should be judicially estopped from pursuing her claims and second arguing Oliver's claims fail on the merits. While I decline to exercise judicial estoppel in this case, I find that no rational trier of fact could find for Oliver on any of her claims. For this reason, Amazon's motion for summary judgment is granted and Oliver's case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that defendant's motion to dismiss (Docket # 49) is **GRANTED**.

**IT IS FURTHER ORDERED** that this case is dismissed. The clerk of court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 13th day of September, 2023.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge

31